Filed 12/8/14  P. v. Valencia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038104 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1105979) |
| v. | |
| JUAN ANTONIO VALENCIA, | |
| Defendant and Appellant. | |

## I.  INTRODUCTION

Defendant Juan Antonio Valencia was convicted after jury trial of five counts of committing a forcible lewd or lascivious act on his niece, G. Doe, a child under the age of 14 (Pen. Code, § 288, former subd. (b)).[1]  At trial, there was also evidence of an uncharged offense by defendant against his sister A. Doe.  The trial court sentenced defendant to 30 years in prison.  Defendant was granted a total of 372 days of presentence custody credit, including 48 days conduct credit pursuant to section 2933.1.  Defendant was also ordered to pay a suspended parole revocation restitution fine of $10,000 pursuant to section 1202.45.

On appeal, defendant contends:  (1) there is insufficient evidence of force, violence, duress, menace, or fear to support the convictions; (2) the trial court erred by

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

admitting into evidence defendant's booking sheet from a prior arrest; (3) the court erred by allowing the jury to submit a question to an expert witness and by allowing certain testimony from the expert witness; (4) the court erred in instructing the jury pursuant to CALCRIM No. 1193 that evidence concerning the Child Sexual Abuse Accommodation Syndrome could be used in evaluating the victim's testimony; (5) the cumulative effect of the errors requires reversal; (6) the court improperly limited defendant's presentence conduct credit under section 29333.1; and (7) the court improperly imposed the parole revocation restitution fine.

We agree with defendant's last two contentions concerning the conduct credit and the fine. As we find no other reversible error, however, we will order the judgment modified to include the correct number of custody credits and to strike the parole revocation restitution fine, and we will affirm the judgment as so modified.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by information filed June 2, 2011, with five counts of committing a forcible lewd or lascivious act on a child under the age of 14 (former § 288, subd. (b)) between January 1 and December 31, 1994. The alleged victim was G. Doe. The information further alleged that a complaint containing the offenses was filed within one year of the date of a report to law enforcement and that there was independent evidence corroborating the allegation.

### A. *The Prosecution's Case*

#### 1. The charged offense involving defendant's niece G. Doe

Defendant was born in 1973 and has several siblings, including two older sisters and two younger sisters. His oldest sister is G.'s mother. G., his niece, was born in late 1983 and was almost 28 years old at the time of trial in 2011. Defendant's other older sister is B., and his two younger sisters are A. and M.

Defendant's niece, G., testified that beginning in approximately 1992, she lived on Delmas Avenue in San Jose with her siblings, her mother, and the person who she

2

believed to be her father. In late 1993, she learned that she and her older brother were not the children of the person who she thought was their father. The revelation was a shock to G., who had been close to this person, who G. referred to as her stepdad at trial. Further, her stepdad and mother were having problems and were going through a separation.

In early 1994, defendant and his girlfriend or wife began living with G.'s family on Delmas Avenue. G. was a 10-year-old fifth grader, who was less than five feet tall and weighed less than defendant. Defendant was 20 years old, 220 pounds, and five feet, five inches tall. Defendant's girlfriend was about six months pregnant. As defendant would leave the house early for work, he and his girlfriend shared a bedroom with G. so that G. could help the girlfriend in case something came up in connection with the pregnancy, such as her water breaking. Defendant and his girlfriend slept in one bed, and G. had her own bed. Staying in the same room to help defendant's girlfriend made G. feel important. She even got to skip school a couple of times to go with the girlfriend to appointments.

Within about a month of moving in with G.'s family, defendant told G. there was something she needed to do in order to become a "big girl." He told her that it might cause her a "little bit of pain but it was something that every girl had to go through in order to be considered a big girl." Defendant talked to G. about it a few times before anything happened, but he did not go into specific detail. G. wanted to be a "big girl." She was in the fifth grade and getting ready for middle school. However, G. did not know what defendant meant by being a "big girl."

Defendant told G. it was a "game" and that "it was something that had to happen." He also said that it was a game he had played with his youngest sister M. and with his niece Ma. who was about a year older than G. When G. questioned defendant about it, he told her "it was something normal," that she could ask her aunt and cousin because he had taken showers with them, and that she had to keep it to herself because that was how

3

she "proved to be a big girl." G. never asked her aunt or her cousin about it because she was "really embarrassed," and "they would probably say it did happen" and laugh because G. "couldn't keep it to [herself] and . . . wasn't old enough to be a big girl."

G. felt that she "was going to have to play that game." She "got along really well" with defendant and his girlfriend and believed "it was something [she] had to go through." G. did not feel that she had a choice and was "dreading" it.

Defendant was referring to G. having sexual intercourse with him, which ultimately occurred at least ten times in their shared bedroom over approximately a three-month period according to G.'s trial testimony. At defendant's preliminary examination about two and a half months before trial, G. testified that she specifically recalled at least five incidents and that there were possibly as many as ten incidents. She had previously told law enforcement that defendant raped her at least 10 times.

During the first incident, defendant told her to take her underpants off, to lie on the bed "face up" with her buttocks on the edge of the bed, and to open her legs. Defendant lowered himself to kneel down. When defendant was trying to put his penis into her vagina, G. tried to close her legs but defendant had his arms between her legs "sort of holding [her] legs apart" and preventing her from closing them. As G. was trying to close her legs, defendant told her not to. Defendant told her to open her legs and "release" herself because she "was getting really tense." G. cried and told him that it hurt a lot. Defendant told her that "it was just going to hurt for a little bit and then [she] was going to be okay." Defendant pulled out before ejaculating. G. cried. Defendant told her to put her clothes on. G. told defendant that she was sore and that it hurt. He told her "it was okay" and that "it was going to go away."

G. did not immediately disclose what had happened because she "didn't want anybody to laugh" at her and because she had been told that it "was supposed to be a secret to become a big girl." G. thought she was "done" and was now a "big girl."

4

Within a few days, however, it happened a second time. Defendant woke up G. in the morning and told her to pull down her pants and get in the same position. G. did what she was told because she "thought [she] had to do it again." Although "he would have his hands on the bed frame generally between [her] legs," she did not recall whether defendant had his arms in between her legs on this occasion. Beginning with this second time or with the third time, the incidents occurred on weekdays about 5:00 a.m. after defendant's girlfriend left the bedroom to make food for defendant. On the mornings when defendant did not rape her, G. stayed in bed sleeping or pretending she was sleeping.

G. felt pain during the first two incidents. She also felt as though she was frozen and could not move. G. recalled a couple of times when she felt like she was in another part of the room and watching what was happening, or "[d]isassociating" herself. She also cried during and after the incidents happened and she had nightmares.

On one occasion, G. saw defendant masturbate after withdrawing his penis from her. On at least two occasions, G. saw defendant lock the door after his girlfriend left the room. The girlfriend tried to reenter the room during one incident. G. pretended she was asleep in bed, and defendant opened the door and stated he might have locked it by "accident."

Defendant never kissed G., hugged her, or touched her in any way other than to put his penis in her vagina. He also did not say anything to G. while they had intercourse, other than to say it was going to be over soon in response to her crying. Defendant did not hit G., did not threaten to hit G., and did not threaten her with punishment if she did not go through the "big girl process" at the time it was happening.

G. testified that the incidents stopped in March 1994 after defendant's girlfriend gave birth to a son. G. previously reported to law enforcement that the incidents occurred between April and June of 1994, because she thought the birth of defendant's son was about the same time that she had moved out of the Delmas Avenue residence. Upon

5

learning that defendant's son was born in March, she clarified that the incidents had stopped at that point, and not when her family moved out of the house.

While G. was attending middle school, her mother asked whether anyone had ever touched her. G. believed "it was a question [her mother] needed to ask [G.] as a mother" and "not because she actually was worried that something might have happened." G. immediately said no because she was embarrassed. She also believed "it would have consequences," meaning that her mom would "lose her family" and it would be G.'s fault. Also, defendant was the "favorite uncle," who took the children to the movies, invited them over for barbecues, and otherwise "had the money and the time" to take the children out. G. was partly afraid that if she said something about the incidents, "all of these other good things would go away." For example, defendant had given G. a "boombox" which she "considered . . . a gift for what happened." Later, G. believed it would "do more harm if [she] said anything than if [she] . . . stayed quiet because they couldn't take back what had happened."

Defendant never threatened to hit or punish her if she did not go along with the "big girl process." After all the incidents occurred, defendant told G. that it was necessary for her to keep it a secret and that if she did not, it would cause problems within the family.

In June 1994, G.'s family moved to Illinois Avenue in San Jose. Defendant, his girlfriend, and their son also lived at the Illinois Avenue residence for about a year or less, but they slept in a different room than G. Defendant used the Illinois Avenue address on personal checks in 1996 and for his driver's license in 1997 even though he no longer lived at that address.

In 1998, G. moved out of the Illinois Avenue residence.

In 2002, G. told her mother that defendant had sexually abused her. G. testified that she made the disclosure after stepping out of church on New Year's Day.

6

G.'s mother testified that the disclosure occurred at her house after she had invited G. to go to defendant's house. G.'s mother did not remember the disclosure occurring on New Year's Day. G.'s mother was shocked by the disclosure. Looking back, however, G.'s mother realized that every time she said defendant was going to be at an event, G. did not show up. G.'s mother never confronted defendant about G.'s disclosure.

At some point, G.'s mother made a comment in G.'s presence that it "may have been true" what had happened to A., who was the younger sister of defendant and G.'s mother. G. did not know what her mother was talking about. G.'s mother had heard from her own mother, who was also A.'s mother, that A. would scream at night as though someone was hurting her and that A. would say someone was raping her in her sleep. G.'s mother heard that A. was taken to a doctor who found nothing wrong with A.

G. testified that in 2005, she believed her younger sister V. went to visit defendant's house in Atwater and ended up staying a couple of nights. G. called her mother and indicated that she did not want her sister V. staying with defendant. V. eventually stayed with G. G. asked V. whether defendant did anything to her, and V. indicated that he had not. G. then disclosed to V. what defendant had done to her.

V. similarly testified that in 2005, when she was 15 years old, her sister G. disclosed what defendant had done to G. V. testified that the disclosure occurred after she was out with defendant and his sister, M. According to V., her mother and G. had an argument, and V. eventually went to G.'s house instead of staying overnight at M.'s house in San Jose. G. told V. that she did not want V. to stay at their aunt M.'s house because of what defendant had done to G. and because it was unsafe for V. to be at M.'s house. G.'s mother similarly testified that G. called her to say that she wanted her sister V. to come back home and be safe instead of being with M. "because there are other people with [M.] and you never know." V. testified that she distanced herself from the family after she learned what defendant had done to G.

7

In 2008 or 2009, G. had a conversation with her aunt A. about defendant molesting G.

At the end of April 2010, G. encountered defendant at a family party at a Chuck E. Cheese's. Since 1998, G. had seen defendant only one other time and they did not speak to each other on that occasion. G. confronted defendant after he tried to hug her. G. told defendant, "I remember exactly what you did to me. And I'm not that little girl anymore, so don't touch me." Defendant backed away and was nervous and sweating. Within a half an hour, defendant left the party with his wife and children. They stated that they needed to see the wife's sister-in-law in the hospital. G.'s mother saw defendant being pushed away by G. and defendant sweating, turning pale and then red, and shaking. G.'s sister V. also saw defendant look nervous or upset and leave shortly thereafter.

G. felt as though she had "conquered the world" and went to the police about a week later. G. had a child who was the same age that G. was when the incidents started with defendant. G. "couldn't imagine" being the same age as her child and having to go through what she had experienced.

G.'s husband was in the country illegally and was laid off because he did not have a valid social security number. G. obtained her deceased brother's birth certificate and gave it to her husband, who used it to get a social security number in order to work. G. testified at defendant's trial under a grant of immunity, meaning she would receive immunity as long as she testified truthfully.

G.'s mother also testified under a grant of immunity. She testified that she had entered into an agreement with an organization called Choices for Children in January 2010. Under the agreement, G.'s mother was to take care of three of her grandchildren and receive payment from the state in return. However, she had someone else take care of the children while she was working fulltime outside the home. She continued to receive money from the state through the organization until June 2010. G.'s mother denied giving some of the money to her daughter-in-law, who is the children's mother.

8

G.'s mother denied giving or selling her deceased son's birth certificate to anyone.

The first report to law enforcement concerning the allegations against defendant was made in May 2010. The complaint in this matter was filed in April 2011.

**2. The uncharged offense evidence involving defendant's sister A. Doe**

A. Doe was born in 1978 and was 33 years old at the time of trial. A. is defendant's second youngest sister.

When A. was younger, she lived in a two-bedroom apartment in San Jose with several other family members. A., defendant, their younger sister M., and their mother slept in one bedroom, as did their father when he was in the country. One of A.'s older sisters B., along with the sister's husband and two children, slept in the other bedroom.

In approximately 1985, when A. was about seven years old and defendant was about 11½ years old, defendant raped A. on one occasion while they were living at the apartment. A. went to sleep and woke up to find her panties pulled down. Defendant was on top of her, pinning her down, and penetrating her vagina with his penis. He was bigger and heavier than her. It was dark outside but it "seemed like dawn." Although everyone was in the apartment when A. had gone to sleep, only she and defendant were in the apartment at the time of the incident. A. felt a lot of pain and told defendant to stop. Defendant did not stop. A. was shaking, screaming, and crying for help. She unsuccessfully tried to push him away. Defendant did not touch her with his hands or kiss her. Defendant asked for her forgiveness after he raped her.

A. continued crying and shaking for a long time after the incident. She eventually went to the bathroom and saw blood on her panties and legs. A. cleaned herself up and left her panties on the floor in the bathroom.

When their mother came home, A. told her what defendant had done. Their mother did not believe A. and thought she was crazy and lying to get defendant in trouble. A. tried to show the panties to her mother but it was not where she had left it.

9

Two days after the incident, defendant told A. not to say anything and that if she did, she was going to "pay for it."

When A. was eight years old, she again tried to tell her mother about defendant, who was "still after" A. for sex. A. told defendant "no" but he kept on insisting. A. was very afraid of defendant and tried to avoid him and find their mother. Their mother did not believe A.

When A. was around 13 years old, defendant asked her to have sex. A. again told their mother, but their mother called her crazy. A. also told one of her older sisters, B., that defendant had raped her. Although A. never observed B. talk to their mother about it, B. had promised to do so.

When A. was about 16 or 17 years old, she stayed at the residence of her sister, G.'s mother, a couple of times. Defendant was still living there. G.'s mother noticed that A. would cry suddenly. A. refused to say what was going on and told G.'s mother that nothing was wrong. G.'s mother thought "it was a boyfriend or boy thing."

A few months after A. got married, she told her husband that defendant had raped her. She made this disclosure because she was having nightmares and was screaming out defendant's name, which made her husband suspicious.

A. denied living with defendant in Winton for a period of time while having marital problems. A. also denied asking her mother about defendant's wealth or to confirm that he owned three businesses.

A. testified that her oldest sister, G.'s mother, approached her in 2003 after "hear[ing] something about" A. and defendant. A. confirmed to G. what defendant had done to her without disclosing every detail.

Somewhere around December 2008 to January 2009, A. talked to her niece, G. A. told G. that in 2003, G.'s mother had told A. that G. had been raped. G.'s mother did not tell A. who did it. A. told G. that she "believe[d G.] whoever it was" because she had

10

"had an experience," too. According to A., she and G. did not disclose to each other that their rapist was defendant.

G.'s mother testified that she never told A. about what defendant had done to G.

A. did not initially report to the police that defendant had raped her. A. was scared because defendant had been threatening her since she turned 13. Defendant wanted to have sex with her, she would refuse, and then he would get angry and threaten her. He told her that their mother gave him permission to send her to a correctional school and that she would never see their father again if she said anything.

A. testified that the rape had "taken a toll" on her and her marriage. She had nightmares, could not sleep, and had episodes of depression.

A. was interviewed by investigators in July 2010 regarding the incident in which defendant had sexually assaulted her. An audio recording of the interview was played for the jury. In the interview, A. also reported that her younger sister M. disclosed that, when M. was about seven years old she had played a game of "horsey" with defendant while both were undressed. A. assumed that defendant had sexually assaulted M., and she did not want to hear more about it from M.

### 3. CSAAS evidence

Carl Lewis testified as an expert in Child Sexual Abuse Accommodation Syndrome (CSAAS). Lewis was a consultant, law enforcement social services trainer, and licensed private investigator. His prior work experience included 25 years as a sworn peace officer. He had 600 or more hours of classroom and workshop training relating to child sexual abuse cases, had taught in that field, and had been involved in investigating about 500 such cases. He was also designated a subject matter expert on child abuse investigation for the California Commission on Peace Officer Standards and Training from 1996 through 2000. Lewis had been qualified in court as an expert on CSAAS about 220 times since 1995.

11

Lewis had not conducted any investigation in defendant's case, did not read any police reports or transcripts, and had not been told anything about the facts of the case by the prosecution. He did not know the defendant, the names of any of victims in the case, the specific charges, or the facts involved in the case. The extent of his knowledge about the case was that "it must involve charges of child sexual abuse."

Lewis explained that CSAAS is information derived from clinical observation, and that it is intended to keep people from automatically ruling out the possibility of abuse based solely on preconceived ideas about the nature of child sexual abuse. CSAAS is "not a disease that someone can be said to suffer from." It is not a diagnostic tool and cannot be used to determine whether someone was sexually abused.

CSAAS has five categories: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed, conflicted, unconvincing disclosure, and (5) retraction. All five categories are not necessarily present in each case of child abuse.

Regarding the category of secrecy, Lewis explained that "child sexual abuse occurs almost exclusively when the offender is alone or isolated with the child." An offender may reinforce the sense of secrecy by telling the child that he or she will get in trouble for disclosing the abuse, that no one will believe the child, or that the child will be harmed. A child may also come to the realization on the child's own that the abuse needs to be kept secret. A child who is trapped with the circumstance of sexual abuse will accommodate or continue to interact with the offender. In this regard, the relationship between the child and the offender does not necessarily change in a way that is "perceivable to people who know" them. For example, if the offender is otherwise being nice or providing gifts to the child, it would not be uncommon for the child to continue to accept those gifts. Lewis also testified that there is usually a delay between the occurrence of the abuse and when it is disclosed.

12

**B.** *The Defense Case*

Defendant's younger sister, M., testified that defendant never molested her, that she never played a naked game of "horsey" with him, and that she never told their sister A. that they had played such a game. She had a "very good" relationship with defendant. He was the godfather of some of her children, and he had watched her children off and on over the years when she needed help. Since M. became aware of her sister A.'s and niece G.'s allegations against defendant in the months before trial, "nothing changed" between defendant and M. or her children.

M. further testified that at the time defendant's girlfriend had a baby in March 1994, the couple was living with defendant's older brother and not with G. or G.'s mother. M. testified that she was 12 years old at that time and that she had lived with the couple off and on during the pregnancy and for about two weeks after the baby was born. Thereafter defendant, his girlfriend, and the baby lived with G.'s mother at the Delmas Avenue residence for about a month and then at the Illinois Avenue residence.

M. also testified that defendant lived in Winton, California beginning in approximately the middle of 1997 for about a year. According to M., A. stayed at the residence with defendant when she was having a problem with her husband.

M. testified that her sister, G.'s mother, lived on Illinois Avenue in 1997. Defendant's driver's license, which was issued on August 21, 1997, reflected the Illinois Avenue address. M. testified that defendant was not living at that address with G.'s mother by that time, and that he was in Winton. M. testified regarding a "practice" in her family that if the family member does not have a stable or permanent address, the family member uses a sibling's or their mother's address as a mailing address.

M. testified that defendant had lived in the San Joaquin Valley since 1998. When M. used to live in San Jose, defendant would sometimes sleep at her house during the workweek rather than drive back home. According to M., G.'s sister V. often stayed at M.'s residence when defendant was present. This continued until V. was about 18 years

13

old, and G.'s mother knew about it. M. testified that V. also visited M. at work, which was a business owned by defendant and his older brother, and that V. went out to lunch with M. and defendant.

M. did not see any discord between G. and defendant at the Chuck E. Cheese's party, and defendant did not appear upset, sweaty, or tense when he left the party.

M. stated that in June 2010, she had a conversation with G. in which G. stated that she was going to trade in her car and get a brand new Lincoln Navigator.

M. told an investigator that when she was about six or seven years old, her mother's then-boyfriend touched her "behind" during a hug goodbye. M. immediately told her mom, who ended the relationship with the boyfriend. To M.'s knowledge, no one notified the police that she had been touched inappropriately.

M. testified that G.'s mother told her that she was getting paid by Choices for Children to take care of her son's children, and that she was giving some of the money to her son. In about 2004, M. saw defendant give G.'s mother a vacuum cleaner as a present.

G.'s mother was recalled to testify during the defense case. She acknowledged that in 2003 and 2004, she let defendant sleep overnight in her house from time to time. To show his appreciation, in late 2004 or early 2005, defendant gave her a vacuum cleaner as a gift. During this timeframe, G.'s mother had children living with her, including her daughter V. and a female baby.

G.'s mother reported to law enforcement that, in 1998 or 1999, A. told her that she had a "nervous crisis." G.'s mother had A. stay with her for a couple of days. A. did not go into detail with G.'s mother about the crisis. A. indicated that no one would believe her and that it was " ' nothing.' " G.'s mother reported that A. "used to wake up screaming."

Defendant's mother testified that she never lived in an apartment in San Jose with defendant and her daughters A. and B. A. as a young child used to hear things that other

14

people did not hear. Further, when A. was a young child, she was taken to doctors for treatment for "problems of things going on in her head." As a child, A. never told her mother that defendant did something sexual to her. The mother testified that she did not learn about A.'s claims until she talked to an investigator. The mother acknowledged that she might have told defense counsel a few months before trial that, in reference to her granddaughter G., "[I]f it was so many times then maybe the girl liked to do that."

Defendant's older brother R. testified that in 1985, he and his sister B. lived next door to each other in one-bedroom apartments in San Jose. In early 1994, R., his wife, and his daughter were living at a different location in San Jose, and defendant and his pregnant wife lived with them for a couple of months until the end of April 1994. Sometime after the baby was born in March and before defendant moved out, their sister M. also lived there. Defendant, his wife, and baby then moved in with defendant's other sister, G.'s mother. R. had never seen defendant act sexually improper while in the company of young girls.

R.'s daughter told R. that her stepfather (who was not defendant or a member of his family) had been touching her in a sexually inappropriate way. R. did not report the matter to the police because the child's mother told him that the child was "making up stuff" and "assured" him that nothing was going on.

A correctional officer with the Merced County Sheriff's Department testified that he had been defendant's neighbor for over four years. The two socialized together and had taken care of each other's children, including the officer's daughter who was almost nine years old by the time of trial. After becoming aware of the charges against defendant, the officer had not altered his relationship with defendant or altered the contact between defendant and the officer's children. The officer had never seen defendant express an unusual interest in girls under the age of 14.

The husband of defendant's wife's sister was the principal of a school. The principal testified that he had socialized with defendant, and that their children had stayed

15

at each other's house. In the six years that he had known defendant, the principal had never seen defendant act in a physically inappropriate way with a child. The principal also had no hesitation in allowing defendant to care for the principal's 11-year-old daughter in the future. The principal's wife was hospitalized at the end of April and beginning of May 2010. Her sister, defendant's wife, visited her on May 1, 2010.

Ma. is the daughter of defendant's sister B. Ma. is about a year older than her cousin G. Ma. testified that she and G. were close until G. was about 14 years old and moved away. On some weekends Ma. slept over at G.'s, including at the Delmas Avenue residence, and they played, showered, and did a lot of things together. G. did not express a dislike for defendant during this time, and Ma. did not observe any unusual behavior between them at any time. Ma. also did not observe any tension between them when G. moved away. Further, defendant did not do or say anything towards Ma. that was sexually inappropriate, and he never said that he wanted to teach Ma. how to be a big girl. Ma. never showered with anyone other than G.

Ma.'s husband, who is also the father of her four children, is the cousin of defendant's former girlfriend. Ma. learned, after being in a romantic relationship with her husband for about 10 years, that he was using the name and identity of her cousin G's deceased brother. Ma. heard rumors that her husband "bought documents" from G.'s mother. When Ma. asked G.'s mother about it, G.'s mother said that defendant had stolen the documents from her and that it was defendant who had sold the documents. After talking to defendant, Ma. set up a meeting with her husband, G.'s mother, and defendant. G.'s mother was the only one who did not show up. Ma. tried to contact G.'s mother for about two months. When Ma. finally reached G.'s mother, G.'s mother told her that she "did not want her children to know anything."

At the preliminary examination a few months before trial, G. testified that defendant never hit, pushed, or forced her in any way during the incidents. Defendant put

16

his hands on the mattress, knelt down, and inserted his penis into G.'s vagina. G. did not remember him running his hands over her.

Defendant did not testify at trial.

### C. *The Prosecution's Rebuttal Case*

G. was interviewed by investigators on June 2, 2010. An audio recording of the interview was played for the jury. G. stated that sometimes in the mornings she pretended she was asleep. As soon as defendant's girlfriend got up to make breakfast, defendant would lock the door. G. felt scared when defendant told her to take off her underwear. G. also cried when defendant referred to what was going to happen. Without being specific, he told her that it was going to hurt, that it was okay, that it was a process that she had to go through, and that a little bit of pain was normal because she was becoming a "big girl." When G. was on the bed with her underwear off, she felt paralyzed.

After all the incidents had occurred, G. was scared. She was afraid of the incidents happening again. Further, defendant told her that if she spoke out, no one was going to like her mother, the family was not going to talk to her, and it was going to be G.'s fault.

### D. *Verdicts and Sentencing*

On September 13, 2011, the jury found defendant guilty of all five counts of committing a lewd or lascivious act on a child by force, violence, duress, menace, or fear. The jury further found that the complaint was filed within one year of when G. Doe reported the offense to a law enforcement agency (§ 803, subd. (f)).

On March 16, 2012, after denying defendant's motion for a new trial, the court sentenced defendant to 30 years in prison. The court granted defendant 372 days of custody credits, consisting of 324 actual days plus 48 days conduct credit pursuant to section 2933.1. Defendant was also ordered to pay various fines and fees, including a suspended parole revocation restitution fine of $10,000 (§ 1202.45).

17

# III. DISCUSSION

## A. *Sufficiency of the Evidence of Forcible Lewd Acts*

Defendant contends that there is insufficient evidence of force, violence, duress, menace, or fear to support the forcible lewd act convictions. He contends that his federal constitutional right to due process has been violated as a result and that the convictions should be reduced to lesser offenses.

The Attorney General argues that there is substantial evidence that defendant molested G. by using force and duress.

We evaluate defendant's contention under a well-established standard of review: "In considering a challenge to the sufficiency of the evidence . . . we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

The trial court instructed the jury that in order to convict defendant of committing a forcible lewd or lascivious act on a child under age 14 in violation of section 288, it had to find that "in committing the act, the defendant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else." (See CALCRIM No. 1111.) The court further specified that "[t]he force used must be substantially different from or substantially greater than the force needed to accomplish the act itself. [¶] Duress means a direct or implied threat of force, violence, danger,

18

hardship, or retribution that causes a reasonable person to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and her relationship to the defendant." (See *ibid*.)

Section 288[2] differentiates between lewd acts (§ 288, subd. (a)) and lewd acts accomplished "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" (*id.*, subd. (b)(1)). In order to be convicted of committing a lewd act by force, the defendant must have used force that was " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' [Citation.]" (*People v. Soto* (2011) 51 Cal.4th 229, 242 (*Soto*).) "[T]his includes acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves. [Citations.]" (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005.)

A defendant commits a lewd act by use of duress if he or she accomplishes the act by making " ' "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in

---

[2] At the time of defendant's crimes against G. in early 1994, section 288 stated in relevant part: "(a) Any person who shall willfully and lewdly commit any lewd or lascivious act including any of the acts constituting other crimes provided for in Part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of the child, shall be guilty of a felony and shall be imprisoned in the state prison for a term of three, six, or eight years. [¶] (b) Any person who commits an act described in subdivision (a) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, shall be guilty of a felony and shall be imprisoned in the state prison for a term of three, six, or eight years." (Stats. 1989, ch. 1402, § 3.) Section 288 has since been amended several times. The amendments are not relevant to the issues raised in this appeal.

19

an act to which one otherwise would not have submitted." ' [Citation.]" (*Soto*, *supra*, 51 Cal.4th at p. 246, italics and fn. omitted.)

In determining the existence of duress or force, "factors such as the position of dominance and authority of the defendant and his continuous exploitations of the victim may be considered. [Citations.]" (*People v. Cardenas* (1994) 21 Cal.App.4th 927, 940.) "Physical control can create 'duress' without constituting 'force.' " (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 (*Schulz*); *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1319 (*Espinoza*).) "[D]uress involves psychological coercion. [Citation.] Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes." (*Schulz*, *supra*, at p. 1005; *Espinoza*, *supra*, at pp. 1319-1320.) Moreover, "[a]s long as the total circumstances support an inference that the victims' participation was impelled, at least partly, by an implied threat," the factual basis of duress is not eliminated by evidence of other motivating factors. (*People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1580.)

We determine that there is substantial evidence to support a finding that defendant accomplished the molestations of G. by force and duress. The incidents occurred in 1994 when G. was 10 years old. Defendant was twice as old, at least five inches taller, and weighed more than her at 220 pounds. Defendant was her uncle, and they shared a bedroom where G. was expected to help defendant's pregnant girlfriend. Defendant told G. that there was something she needed to do in order to become a "big girl," that it might cause her "pain but it was something that every girl had to go through," and that this was "something that had to happen." G. felt that she had no choice and that "it was something [she] had to go through." She was "dreading" it. During the first incident, defendant told G. which clothes to take off and how to position herself on the bed. As defendant attempted to put his penis into G.'s vagina, G. tried to close her legs but defendant's arms prevented her from closing them. Defendant told her to not close her legs, to open them, and to "release" herself because she "was getting really tense."

20

G. cried and told defendant that it hurt a lot. Defendant told her that "it was just going to hurt for a little bit and then [she] was going to be okay." Subsequent incidents usually took place after defendant's girlfriend left the room in the morning. G. saw defendant lock the door on at least two occasions. G. cried during and after the incidents.

Based on this record, there is substantial evidence that defendant committed the first act of molestation by force, in view of the evidence that he physically prevented G. from closing her legs while trying to penetrate her vagina with his penis. The jury could have reasonably concluded that defendant used force that was " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " (*Soto*, *supra*, 51 Cal.4th at p. 242.)

There is also substantial evidence that defendant committed all of the molestations by use of duress. In this regard, the jury could have reasonably found that defendant accomplished the molestations by making an implied threat of force. Defendant was in a position of authority in G.'s life in view of their familial relationship and the circumstances of their living arrangements. G. was also at a young age when the incidents occurred, while defendant was twice as old and physically much bigger than G. Significantly, defendant told G. that she "had to go through" with the incidents and that it was "something that had to happen." Defendant also prevented G. from closing her legs during the first incident, and he told her to not close her legs, to open them, and to "release" herself as she had tensed up. He also indicated that he was going to keep molesting her despite her crying and despite her complaint that it hurt a lot. Further, defendant locked the door on at least two occasions. Based on this record, the jury could reasonably find that defendant communicated to G. by his words and conduct that she had to go through with the molestations and that any effort to resist would be met with force. The jury could have therefore reasonably concluded that defendant made an implied threat of force to accomplish the acts of molestation that he would not have been able to otherwise accomplish. (*Soto*, *supra*, 51 Cal.4th at p. 246.)

21

Accordingly, we determine that there is substantial evidence that defendant committed the lewd acts by use of force and duress. (*Albillar*, *supra*, 51 Cal.4th at pp. 59-60.)

B. *Admission of Defendant's Booking Sheet from a Prior Arrest*

Defendant contends that the trial court erred in admitting into evidence his booking sheet from a prior arrest on January 27, 1994, that his right to due process was violated, and that the error was prejudicial. Specifically, he argues that the booking sheet, which indicated that he lived on Delmas Avenue, was cumulative because the following documents admitted into evidence already established that he lived at that address in 1994: his January 28, 1994 driver's license, his son's birth certificate, and the medical records pertaining to the birth of his son. He further argues that evidence of the arrest might have misled the jury into believing he had a criminal history, and that the jury might have speculated that it was for other child sex crimes or other more serious crimes.[3] In this regard, defendant observes that the charges were redacted on the booking sheet and that the trial court did not give a limiting instruction concerning the jury's use of the booking sheet.

The Attorney General contends that the booking sheet was relevant to establish (1) where defendant lived at the time the molestations occurred and (2) his height and weight at the time the molestations occurred. The Attorney General further contends that the booking sheet was not cumulative, that it did not unfairly prejudice defendant, and that any error in admitting it was harmless.

---

[3] Although defendant provides various citations to the record to support his assertion that he was booked in 1994 for the sale and transportation of marijuana, the record does not clearly establish that the two warrants listed on the booking sheet were for those charges.

In reply, defendant contends that the prosecutor sought to admit the booking sheet for the sole purpose of establishing that defendant lived at the Delmas Avenue address in 1994. He further argues that, with respect to his height and weight, his January 28, 1994 driver's license, which was admitted into evidence, already established those facts.

### 1. Background

During the prosecution's case-in-chief, G. testified that defendant had molested her while they were living on Delmas Avenue in early 1994. G. further testified that the incidents stopped in March 1994 after defendant's girlfriend gave birth.

The defense theory of the case, as articulated in opening statements, was that defendant did not have sexual intercourse with G., and that defendant and his pregnant girlfriend did not live with G. and her mother on Delmas Avenue until after defendant's son was born. Defense counsel, in response to an objection on cross-examination during the prosecution's case-in-chief, explained to the trial court that the prosecution "is wanting to show that both [defendant and his girlfriend] used the Delmas address . . . when I say they were living elsewhere . . . ." In subsequent cross-examination, the defense sought to establish that G.'s mother allowed defendant and his girlfriend to use G's mother's address for various matters, such as for bank statements being mailed to defendant and for communications with the DMV, even though defendant and his girlfriend were living elsewhere. For example, after being shown defendant's August 1997 driver's license, which reflected G.'s mother's Illinois Avenue address in San Jose, G.'s mother acknowledged that defendant was not living at that address in 1997. Similarly, when shown carbon copies of checks defendant had written in 1996 with the Illinois Avenue address preprinted on them, G.'s mother testified that "you can still have your checkbook with an old address and still use it until you run out of checks."

Near the end of the prosecution's case-in-chief, the prosecutor introduced into evidence several exhibits. Relevant here, the prosecution introduced into evidence a copy of defendant's driver's license that was issued on January 28, 1994. The address on the

23

driver's license is Delmas Avenue in San Jose. The prosecution next introduced into evidence without objection the birth certificate for defendant's son, who was born in March 1994. The birth certificate reflects that the "residence" of the child's mother, who was defendant's girlfriend, was Delmas Avenue in San Jose.

Immediately thereafter, and before the prosecution offered its next exhibit, which were certified copies of a San Mateo County Sheriff's Office Identification Information sheet and a booking sheet for defendant from January 27, 1994, defense counsel indicated to the trial court that he wanted to approach the bench. The court asked, "Is this what we discussed in chambers?" The prosecution stated, "Correct." Defense counsel stated, "Another matter has come up." At a sidebar conference, defense counsel argued that the next prosecution exhibit, specifically the booking sheet for defendant, was "more prejudicial than probative." Defense counsel stated, "The reason [the prosecutor] wants to bring that in is to show in 1993 [*sic*] he was using the address of . . . Delmas. I will stipulate for the record on a particular date in 1993 [*sic*]." After defense counsel realized that the booking sheet was from 1994, not 1993, he stated, "I will stipulate that makes it even less probative because we already have the birth certificate showing 1994." The court responded, "That is exactly what you said in chambers and I already ruled on that." After the prosecutor indicated that she wanted the exhibit admitted into evidence rather than a stipulation, defense counsel referred to the "prejudicial effect of the arrest" if the booking sheet was admitted into evidence. The court responded, "I understand. And in chambers you expressed the same ideas and I said I did [an Evidence Code section] 352 analysis and I find it is probative and not unduly prejudicial." Defense counsel "renew[ed]" his objection and argued that an arrest "in and of itself" was prejudicial and that the exhibit had no probative value. The court responded, "I understand. . . . I've made my ruling."

Thereafter, the prosecution introduced into evidence the Identification Information sheet and the booking sheet. The booking sheet, which is from the San Mateo County

Sheriff's Office, indicates that defendant was arrested on January 27, 1994, that he did not have a "prior SMCSO booking" or "state history," that he was calm and quiet, that his address was Delmas in San Jose, and that his "emergency contact" was G.'s mother at the same address and at the same phone number as defendant. The booking sheet further indicates that defendant was arrested on two warrants.

After the booking sheet was introduced into evidence, defense counsel requested that "the amount of bail be obliterated" from the booking sheet. The trial court granted the request by stating, "Okay. We will do that before it's sent to the jury." The bail amounts for the two warrants are redacted on the booking sheet.

The charges regarding the two warrants are also redacted. It is not clear from the record on appeal when the charges were redacted or how it came about that they were redacted.

During the prosecution's rebuttal case, the prosecutor introduced into evidence without objection the medical records of defendant's girlfriend from 1994 regarding her pregnancy, the birth of defendant's son, and postpartum visits. The telephone number that is listed for the girlfriend in some of the medical records is the same telephone number that is listed for defendant and for G.'s mother on defendant's booking sheet.

### 2. Analysis

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." In conducting this analysis, " 'prejudicial' is not synonymous with 'damaging,' but refers instead to evidence that ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues. [Citations.]" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence. [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) Thus, error in admitting evidence pursuant to Evidence Code section 352 may be found only " 'on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Generally, "evidence of mere arrests is inadmissible because it is more prejudicial than probative," due to the danger that the jury will find that the defendant "has an untrustworthy and criminal character." (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1523.) Thus, a booking sheet showing that a defendant has been arrested on a previous occasion should not be admitted unless the booking sheet has a strong probative value that is not "substantially outweighed" by its prejudicial effect. (Evid. Code, § 352.)

We determine that the trial court did not abuse its discretion in finding that the probative value of the booking sheet was not substantially outweighed by any prejudicial effect. Whether defendant was living with G. and her mother on Delmas Avenue at the time the molestations occurred in early 1994 was a significant issue that was contested by the defense. During the prosecution's case-in-chief and before the booking sheet was admitted into evidence, the defense sought to establish that defendant and his girlfriend did not live at the Delmas Avenue address during the time that G. testified she was molested by defendant, and that defendant often used G.'s mother's address for various communications or matters when he was not actually living at her address. The booking sheet, which showed defendant's address and G.'s mother's address as Delmas Avenue in early 1994, around the time the molestations took place, was consequently highly probative on this issue.

Further, we are not persuaded by defendant's contention that the booking sheet was merely cumulative and should have been excluded on that basis. By the time the

26

trial court made its ruling on the record and admitted the booking sheet into evidence, the defense had elicited testimony from G.'s mother on cross-examination that defendant had used her address on personal checks and on a 1997 driver's license even though he was not actually living there. Hence the prosecution's subsequent introduction of defendant's 1994 driver's license and his son's 1994 birth certificate did not conclusively establish defendant's residence on Delmas Avenue, as he might have similarly been using G.'s mother's address for those documents when he was not living at that address. Moreover, the fact that defendant's address was listed as Delmas Avenue on the booking sheet could be viewed as more persuasive evidence of defendant's true address in view of the fact that it was a record from law enforcement. " 'Evidence that is identical in subject matter to other evidence should not be excluded as "cumulative" when it has greater evidentiary weight or probative value.' [Citations.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 669.)

We further observe that the booking sheet was admitted into evidence *before* defendant's girlfriend's medical records were admitted into evidence, and thus the booking sheet could not be considered cumulative to the medical records. Moreover, the medical records, which showed defendant's girlfriend's telephone number but not her address, were significant only because the booking sheet linked the same telephone number to the Delmas Avenue residence.

Regarding the trial court's failure to give a limiting instruction concerning the booking sheet, the record does not reflect that defendant requested such an instruction below. (See Evid. Code, § 355 ["upon request" a court is required to give a limiting instruction "restrict[ing] the evidence to its proper scope"].) Similarly, regarding the redaction of the charges from the booking sheet, it does not appear from the record on appeal that defendant objected to the redaction of those charges.

27

In sum, we determine that no abuse of discretion has been shown by the admission of defendant's 1994 booking sheet into evidence. Further, no due process violation has been shown.

## C. *Admission of Testimony in Response to a Jury Question*

We understand defendant to contend that the trial court prejudicially erred by allowing the jury to submit a question to Lewis, the CSAAS expert, regarding the common behavior of a parent after a child has disclosed abuse to the parent. According to defendant, this "invited the jury to seek an opinion from Lewis on the credibility of [G.'s mother], one of the key prosecution witnesses, and intruded upon the province of the jury as the ultimate evaluator of a witness's credibility." We further understand defendant to contend that the court prejudicially erred in allowing the prosecutor to subsequently ask Lewis questions about the common behaviors of other family members after abuse has been disclosed by a child. Defendant contends that the errors violated his rights to due process and a fair trial.

The Attorney General contends that defendant has forfeited his claim because he never objected to the question from the jury or to follow-up questions from the prosecutor. The Attorney General further contends that the trial court did not err in allowing the questions, and that any error was not prejudicial.

In reply, defendant contends that his motion to exclude Lewis's testimony regarding CSAAS on timeliness grounds and his motion to exclude CSAAS evidence during the prosecution's case-in-chief "properly preserved" the issue he now raises concerning the jury's question and the prosecutor's follow-up questions. Defendant also contends that this court has the discretion to consider his claim even in the absence of an objection below.

### 1. Background

Prior to trial, defendant filed a motion in limine to exclude testimony by Lewis regarding CSAAS on the ground that Lewis had not been identified as a witness by the

28

prosecution in a timely fashion. The trial court denied the motion. Defendant also moved in limine to limit CSAAS evidence to a specific myth or misconception suggested by the evidence. He argued that testimony concerning any other myth under CSAAS should be excluded pursuant to Evidence Code section 352. The court ruled that Lewis would be allowed to testify regarding all five categories of CSAAS.

As part of the trial court's general instructions before opening statements, the court instructed the jury pursuant to CALCRIM No. 106 that the jury may write out a question for a witness, and that the court would discuss the question with the attorneys and decide whether it may be asked.

During trial, defendant moved to exclude evidence regarding CSAAS during the prosecution's case-in-chief. The prosecution opposed the motion, arguing that the evidence was relevant to the prosecution's case-in-chief and that defendant had not cited legal authority supporting his position. The court denied the motion.

Lewis testified regarding CSAAS near the end of the prosecution's case-in-chief. After he was examined by the prosecution and the defense, the trial court asked the jurors whether they had any questions for Lewis. The court received a written question from a juror. An unreported sidebar conference was held, and then the court read the juror's question to Lewis without objection as follows: "In your experience is it common or uncommon for the parent of an alleged victim to verbally question or confront the alleged child abuser once their child has told them about the abuse? . . . [C]onsidering they know the alleged abuser personally." Lewis responded: "I certainly have investigated cases where those confrontations have been made."

The trial court then allowed "follow-up" questions by the prosecution and the defense. In response to questions by the prosecution, Lewis testified without objection as follows:

"[THE PROSECUTOR]: Have you investigated cases where those confrontations have not been made?

"[LEWIS]: Yes.

"[THE PROSECUTOR]: Is it common or uncommon in a family situation where it's another family member committing the sexual abuse or other family members to basically accommodate the offender?

"[LEWIS]: That's common.

"[THE PROSECUTOR]: Is it common for the family to continue to associate even once they become aware of the sexual offense?

"[LEWIS]: Yes.

"[THE PROSECUTOR]: Why is that?

"[LEWIS]: Because of the nature of child sexual abuse there often is not a clearly identifiable sign that the offense took place. And so, often family members will have lingering doubt, and may still continue to associate with the other members of their family. Perhaps not fully supporting the child who's made the allegation, but instead trying to minimize any impact on the family by maintaining peace, essentially.

"[THE PROSECUTOR]: Do the family members who basically ignore what they learned, are they also concerned about other members of the family who may not know about the offense in your experience?

"[LEWIS]: Concerned in terms of protection of other children perhaps?

"[THE PROSECUTOR]: That or concerned not wanting to upset other family members?

"[LEWIS]: Yes, I've seen that.

"[THE PROSECUTOR]: Would you say that's common or uncommon or can you characterize it either way?

"[LEWIS]: It's difficult to characterize. I have seen it in families and I have also seen families where the opposite was true."

Lewis was subsequently asked by the defense whether, "[i]n that same context," there is "a difference between mothers and fathers, that is, the mothers tend to be more or

less protective than fathers." Lewis explained in part that it depended on the nature of the abuse and the identity of the abuser. The defense also posed the following question to Lewis: "Let us assume that a child makes a revelation to a parent that the child has been abused by a member of the family. And within the family, not necessarily the immediate unit of which the child is a part but the extended family, there are many, many young children. Is it your experience that the report that goes to the parent of the alleged abused child remains unshared, or does the report get disseminated within the family to protect the other children, or does it go both ways?" Lewis responded that "it can go both ways" and that he knew of a couple of case where there were efforts to protect other children in the extended family.

## 2. Analysis

" 'A party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless: "There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion." ' [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171 (*Ramos*); accord, *People v. Doolin* (2009) 45 Cal.4th 390, 448 (*Doolin*).)

"A properly directed motion *in limine* may satisfy the requirements of Evidence Code section 353 and preserve objections for appeal. [Citation.]" (*Ramos*, *supra*, 15 Cal.4th at p. 1171.) " '[T]he general rule is that "when an in limine ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal . . . ." ' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 159 (*Letner*), italics omitted.) "[A]n in limine motion, without a contemporaneous objection at trial, is sufficient to preserve an objection for appeal only when '(1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence;

31

and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context.' " (*Id.* at p. 160.)

Lewis testified as an expert "in the area of the Child Sexual Abuse Accommodation Syndrome," which addresses the misconceptions about how a child may act if the child has been abused. Defendant's motions before and during trial sought to exclude or limit this testimony by Lewis regarding CSAAS. Defendant does not point to any objection he made below concerning the admission of evidence about Lewis's experience concerning the common reactions of family members to the disclosure of child sexual abuse. Indeed, it appears that neither the prosecution nor the defense contemplated this issue in any of their motions in limine, and that the issue first arose in the jury's question after the prosecution and defense had initially completed their examination of Lewis. Defendant also does not point to any objection he made to the court's general procedure of taking juror questions, or to the specific question by the jury at issue in this appeal. Defendant also did not object to any of the follow-up questions the prosecutor posed to Lewis after Lewis had answered the jury's question. In view of this record, we determine that defendant has forfeited his challenge to the admission of Lewis's testimony in response to the jury question and in response to the prosecutor's follow-up questions. (Evid. Code, § 353; *Ramos*, *supra*, 15 Cal.4th at p. 1171; *Doolin*, *supra*, 45 Cal.4th at p. 448; *Letner*, *supra*, 50 Cal.4th at pp. 159-160.)

Even if we were to determine that the objection is not waived, we would determine that the trial court did not err in admitting the testimony by Lewis in response to the jury's and prosecutor's questions.

The opinion testimony of an expert witness is admissible if it is, among other things, "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).) " '[T]he admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission . . . .

[E]ven if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [or women] of ordinary education could reach a conclusion as intelligently as the witness." ' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 (*McAlpin*).) "[T]he decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' [Citation.]" (*Id.* at p. 1299.)

We find *McAlpin* instructive. In *McAlpin*, the defendant was on trial for lewd conduct with a child. The child testified about defendant's molestation of her and subsequent events, and the child's mother, whom the defendant dated, "corroborated much of her daughter's testimony." (*McAlpin*, *supra*, 53 Cal.3d at p. 1296.) However, the mother also testified that she continued to date the defendant after her daughter disclosed the molestation to her, and that she (the mother) did not report the matter to the police.

The California Supreme Court determined that expert testimony regarding why a parent might fail to report a child molestation was relevant because it rehabilitated the testimony of the victim's mother who corroborated the victim's claim. (*McAlpin*, *supra*, 53 Cal.3d at p. 1302.) The expert in *McAlpin*, a police officer, "had received from 350 to 400 hours of specialized training in such topics as juvenile and adolescent psychology, physical, sexual or emotional abuse of children, intervention in family crisis situations, investigation of child abuse charges, behavioral responses of child abuse victims, and the dynamics of child abuse offenders." (*Id.* at p. 1298.) The officer "put his training to use on a daily basis in his work as the juvenile investigator for his local police department, and in that capacity he had investigated over 100 cases of child abuse or molestation during the preceding 4 years. He had also taught and spoken extensively on the topic, and had testified several times as an expert witness." (*Ibid.*)

The California Supreme Court explained that the expert witness's testimony was not introduced for purpose of proving that the victim was in fact molested, "but to rehabilitate the corroborating testimony of . . . her mother." (*McAlpin*, *supra*, 53 Cal.3d at p. 1301.) In this regard, the defense on cross-examination had "sought to impeach [the mother's] credibility by strongly implying that her behavior after the alleged incident was inconsistent with that of a mother who believed her daughter had been molested." (*Ibid.*)

In determining that the trial court did not abuse its discretion in admitting the testimony by the expert, the California Supreme Court explained: "Most jurors, fortunately, have been spared the experience of being the parent of a sexually molested child. Lacking that experience, jurors can rely only on their intuition or on relevant evidence introduced at trial. It is reasonable to conclude that on the basis of their intuition alone many jurors would tend to believe that a parent of a molested child, naturally concerned for the welfare of the child and of other children, would promptly report the crime to the authorities, just as a parent would be likely to do if the child complained of someone who had beaten him or stolen his pocket money. Yet here the prosecution had evidence to the contrary -- the expert opinion of Officer Miller that in fact it is not at all unusual for a parent to refrain from reporting a known child molestation, for a number of reasons. Such evidence would therefore 'assist the trier of fact' (Evid. Code, § 801, subd. (a)) by giving the jurors information they needed to objectively evaluate [the mother's] credibility. And the evidence was clearly relevant (*id*., § 210) because it tended to rehabilitate the testimony of [the mother] as a corroborating witness." (*McAlpin*, *supra*, 53 Cal.3d at p. 1302, fns. omitted.)

Similarly, in this case, Lewis testified concerning his extensive training and experience in investigating child sexual abuse cases. The challenged testimony by Lewis in response to the question from the jury, and in response to follow-up questions from the prosecutor, addressed the common reactions of family members to a disclosure of child abuse. This testimony gave jurors information they needed to properly evaluate various

34

family members' credibility.  The information was relevant because it tended to rehabilitate the testimony of G.'s mother and G.'s sister V., who did not confront defendant and who apparently continued to associate with him even after G. disclosed that she had been molested by him.  To the extent our Supreme Court has recognized in *McAlpin* that such evidence may be relevant, useful, and admissible in a given case, as an intermediate court, we are in no position to rule otherwise.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Accordingly, we determine that the trial court did not err in admitting Lewis's testimony, in response to a juror's question and in response to follow-up questions by the prosecutor, regarding the common reactions of family members to a disclosure of child abuse.

### D.  *CALCRIM No. 1193*

Defendant contends the trial court erred by instructing the jury pursuant to CALCRIM No. 1193 that it could use CSAAS evidence "in evaluating the believability of [G.'s and A.'s] testimony."  Defendant contends that CSAAS evidence may not be used to determine whether the victim's claim of abuse is true, or as direct proof of the defendant's guilt.  According to defendant, the quoted language from CALCRIM No. 1193 improperly "permits the jurors to consider this expert testimony [regarding CSAAS] as supportive of the truth of the allegations made against the defendant."

The trial court instructed the jury pursuant to CALCRIM No. 1193 as follows: "You have heard testimony from Carl Lewis regarding Child Sexual Abuse Accommodation Syndrome.  Carl Lewis's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him.  [¶]  You may consider this evidence only in deciding whether or not [G.'s] and/or [A.'s] conduct was not inconsistent with the conduct of someone who has been molested or sexually assaulted, and in evaluating the believability of their testimony."

35

" 'In assessing a claim of instructional error, "we must view a challenged portion 'in the context of the instructions as a whole and the trial record' to determine ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " [Citation.]' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 1025.)

Expert testimony regarding CSAAS is not admissible "to prove that the victim was in fact abused on this occasion. [Citations.] But in such a case such expert testimony 'is admissible to rehabilitate [the victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.]' [Citation.]" (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1383.)

CALCRIM No. 1193 specifically informs the jury that expert testimony regarding CSAAS "is not evidence that the defendant committed any of the crimes charged against [him]." The instruction also tells the jury it "may consider this evidence only in deciding whether or not [G.'s and/or A.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [their] testimony." Regarding this last phrase concerning the "believability" of G.'s or A's testimony, CSAAS evidence disabuses the jury of misconceptions it may hold regarding the reaction of a child to sexual abuse (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744), and such evidence is relevant and admissible "if an issue has been raised as to the victim's credibility" (*id.* at p. 1745). Accordingly, jurors may use the evidence in evaluating an alleged victim's credibility or believability because the evidence regarding CSAAS informs them that some beliefs they may hold about the behaviors of sexually abused children as a class may be incorrect. CALCRIM No. 1193 thus correctly states the law, and we are not persuaded by defendant's contention that the instruction likely misled the jury in that regard.

36

**E.** *Cumulative Error*

Defendant contends that the cumulative effect of the trial errors requires reversal. (See *People v. Hill* (1998) 17 Cal.4th 800, 844.) Inasmuch as we have not found any errors, we reject defendant's claim of cumulative error.

**F.** *Presentence Conduct Credit*

At sentencing, the trial court granted defendant 372 days of custody credits, consisting of 324 actual days plus 48 days conduct credit pursuant to section 2933.1. On appeal, defendant contends the court erred by restricting his conduct credit pursuant to section 2933.1 because his offenses were committed before the operative date of that section. Defendant further contends that he is entitled to 162 days conduct credit pursuant to a former version of section 4019.

The Attorney General concedes that section 2933.1 does not apply to defendant. The Attorney General also agrees that defendant's conduct credit should be calculated using the method of deeming six days served for each four days in custody, although under a different version of former section 4019 than cited by defendant. We find the Attorney General's concession concerning section 2933.1 appropriate.

Section 2933.1 provides for a 15 percent limitation on presentence conduct credit under section 4019 for defendants convicted of a violent felony under section 667.5, subdivision (c). (§ 2933.1, subds. (a), (c); *People v. Palacios* (1997) 56 Cal.App.4th 252, 258 (*Palacios*).) A violent felony under section 667.5, subdivision (c) includes a lewd act on a child under section 288. (§ 667.5, subd. (c)(6).) However, section 2933.1 applies only to offenses "committed on or after the date on which this section becomes operative." (§ 2933.1, subd. (d).) Section 2933.1 became effective on September 21, 1994. (Stats. 1994, ch. 713, §§ 1, 2; *Palacios*, *supra*, 56 Cal.App.4th at p. 256.)

In this case, G. testified that the last time defendant molested her was prior to the birth of defendant's son. The parties stipulated that defendant's son was born in March 1994. Because defendant's offenses were committed before September 21, 1994, the

15 percent limitation on presentence conduct credit in section 2933.1, subdivision (c) does not apply to defendant. (§ 2933.1, subd. (d); *Palacios*, *supra*, 56 Cal.App.4th at p. 256.)

Having concluded that section 2933.1 does not apply to defendant, we turn to the question of which version of section 4019 applies to the calculation of defendant's presentence conduct credit.

As we have stated, the record reflects that defendant committed his offenses in 1994. The record further reflects that he was in presentence custody from the date of his arrest on April 28, 2011, through sentencing on March 16, 2012.

The version of section 4019 in effect at the time of defendant's offenses in 1994 authorized two days of conduct credit for every four days spent in local custody. (Former § 4019, subd. (f), as amended by Stats. 1982, ch. 1234, § 7; *People v. Brown* (2012) 54 Cal.4th 314, 318 & fn. 4 (*Brown*).) Section 4019 was subsequently amended, operative January 25, 2010, to "increas[e] the rate at which prisoners in local custody could earn conduct credits for good behavior. Under the new formula, eligible prisoners could earn two days of conduct credit for every two days spent in local custody.[]" (*Brown*, *supra*, at pp. 318-319; accord, Stats. 2009, 3d Ex. Sess., 2009-2010, ch. 28, § 50.) The January 2010 version of section 4019 "applied prospectively, meaning that qualified prisoners in local custody first became eligible to earn credit for good behavior at the increased rate beginning on the statute's operative date." (*Brown*, *supra*, at p. 318.) However, if a defendant was committed for a serious felony, as defined in section 1192.7, the defendant earned conduct credit at a less favorable rate of two days for every four days of actual custody under the January 2010 version of section 4019. (Stats. 2009, *supra*, ch. 28, § 50 [former section 4019, subds. (b)(2), (c)(2) & (f)].)

38

In this case, defendant's offenses for lewd acts on a child under age 14 are serious felonies within the meaning of section 1192.7, subdivision (c)(6). Consequently, under the January 2010 version of section 4019,[4] defendant was entitled to earn conduct credit at the rate of two days for every four days of actual custody. (Stats. 2009, *supra*, ch. 28, § 50 [former section 4019, subds. (b)(2), (c)(2) & (f)].) Based on his 324 actual days in custody, defendant is entitled to 162 days conduct credit (see *In re Marquez* (2003) 30 Cal.4th 14, 25-26) for a total of 486 days of custody credits. We will modify the judgment accordingly.

### G. *Imposition of Parole Revocation Restitution Fine*

At sentencing defendant was ordered to pay a suspended parole revocation restitution fine of $10,000 pursuant to section 1202.45. On appeal, defendant contends the court erred in imposing the fine because his offenses were committed in 1994, before section 1202.45 became effective.

The Attorney General concedes that the fine must be stricken because section 1202.45 was not operative until after defendant committed his offenses. We find the concession appropriate.

Section 1202.45 requires a court to assess a parole revocation restitution fine "[i]n every case where a person is convicted of a crime" and the "sentence includes a period of parole." (*Id.*, subd. (a).) Section 1202.45 was enacted in 1995. (Stats.1995, ch. 313, § 6; *People v. Callejas* (2000) 85 Cal.App.4th 667, 669 (*Callejas*).) Defendant's crimes were committed in 1994. The imposition of a parole revocation restitution fine under section 1202.45 on a defendant who committed the underlying crime prior to the

---

[4] More recent versions of sections 4019 and 2933 do not apply to defendant because the date his offenses were committed, or the nature of his offenses (serious felonies), render the conduct credit formulas under those more recent versions inapplicable to defendant. (See § 4019, subd. (h); Stats. 2010, ch. 426, § 1 [former § 2933, subd. (e)(3)]; Stats. 2010, ch. 426, § 2 [former § 4019, subd. (g)].)

enactment of the fine is prohibited by the ex post facto clause.  (*Callejas*, *supra*, at pp. 669, 676, 678.)  Accordingly, we will strike the fine.

## IV.  DISPOSITION

The judgment is ordered modified (1) to state that defendant is entitled to 324 actual days plus 162 days conduct credit under Penal Code section 4019, for a total of 486 days of presentence custody credits, and (2) by striking the ordered parole revocation restitution fine under Penal Code section 1202.45.  As so modified, the judgment is affirmed.  The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:



_____
ELIA, ACTING P.J.




_____
MIHARA, J.